CLERK OF THE
DISTRICT COURT
TERRY HALPIN

2018 FEB 23 AM 9 55

FILED
BY ___KB___
DEPUTY

Michael G. Eiselein
Eiselein Law Firm PLLC
5245 Staton Dr.
Billings, MT
PO Box 1729
Billings, MT 59103
(406) 252-3461
*Attorney for Plaintiffs*

## MONTANA THIRTEENTH JUDICIAL DISTRICT COURT,
## YELLOWSTONE COUNTY

| | |
|---|---|
| Pamela Jackson<br><br>Plaintiff,<br><br>vs.<br><br>Billings Clinic and Christopher Goulet, MD<br><br>Defendants. | Cause No. DV 18-0261<br><br>Judge: **Dept. 1**<br><br>**COMPLAINT and Demand for Jury Trial**<br><br>120/149371 |

COMES NOW the Plaintiff, and for her claims against the Defendants states and alleges as follows:

### THE PARTIES

1. **Pamela Jackson** is a resident and citizen of the State of Wyoming.

2. **Billings Clinic** ("Clinic") is a healthcare facility in Yellowstone County that provides, among other things, diagnoses and treatments for breast cancer.

3. **The Clinic** employs physicians, nurses and other health care providers. It is legally responsible for the negligent acts or negligent omissions of its

1

Complaint and Jury Demand


EXHIBIT A

employees when they are engaged in the practice of medicine or the delivery of healthcare to patients of the Clinic.

4. **Christopher Goulet, MD** is a radiation oncologist employed by and practicing at Billings Clinic.

**FACTS**

5. On June, 2015 Pamela Jackson, age 48, had a screening mammogram at Banner Health Clinic in Worland, Wyoming. The mammogram revealed a small lump in her right breast that her Wyoming physician deemed appropriate for follow-up.

6. On July 20, 2015, she had surgery – known as a "lumpectomy" – to remove the small lump of tissue.

7. Pathology review of the lump revealed the presence of a type of cancer known as a Grade 1 invasive ductal carcinoma. Grade 1 cancer cells are slower growing, less aggressive and less likely to spread than Grade 2 or Grade 3 cancers. The tumor was very small – 0.9 cm. Pathology proved there were no cancer cells near the margin of surgical excision.

8. Further studies, including a lymph node biopsy done on August 11, 2015, revealed that the cancer had not spread to Pamela's lymph nodes or metastasized to other parts of her body.

9. A test known as the Oncotype DX breast cancer recurrence test provides useful information about the likelihood of recurrence of breast cancer. It is scored on a scale from 0 to 100. The lower the score, the lower the risk of breast cancer recurrence and the better the prognosis. Pamela's Oncotype DX score was 11.

10. Following her lumpectomy, based on the grade and stage of her cancer, Pamela's treatment choices included 1) no further treatment; 2) lumpectomy combined with hormonal therapy or 3) lumpectomy with hormonal therapy *and* radiation treatments, or; 4) mastectomy.

11. Pamela first saw Dr. Goulet on August 10, 2015 before the results of her lymph node biopsy and her Oncotype DX results were available. Dr. Goulet wrote in Pamela's chart on that day that *"She comes to discuss her radiation options."* (MMLP 467). He offered her no other treatment options. He told her that if she did not have his recommended radiation treatments her cancer would "probably come back."

12. When Pamela asked Dr. Goulet about possible side effects of radiation he said her skin will look like it was sunburned and then tanned but that it is rare that it gets worse than that. He did not inform her of all of the risks of radiation.

13. On September 8, 2015, Pamela started Dr. Goulet's radiation treatments. Those treatments continued every day (except Saturday and Sunday) for 21 days, ending on October 6, 2015.

14. After Pamela's second day of radiation, she told Dr. Goulet and Clinic nurses that her irradiated breast was extremely painful and red. After each radiation treatment Pamela complained to Dr. Goulet's and the Clinic's nurses and physical therapists that the pain in her radiated breast was continuing to increase. She would show them that her right breast was becoming inflamed, swollen and hard in a way that is not normal for the vast majority of women who receive similar radiation treatment. He dismissed her complaints; told her it was "just mastitis" and appeared impatient and annoyed when she would tell him that "something is not right."

15. At no time did Dr. Goulet offer to suspend the daily irradiations of her breast for long enough to investigate, consult with colleagues, or read the medical literature in order to determine the cause of her problem or whether the irradiation of her breast should be stopped. Instead, he told her to "wear a tighter bra."

16. By the end of Dr. Goulet's "treatment plan" the tissue in the irradiated area was so profoundly damaged that Pamela required a radical mastectomy and

4

numerous painful reconstructive and plastic surgeries in an attempt to restore both appearance and function.

## VIOLATIONS OF THE STANDARDS OF CARE
### Informed Consent

17. All patients have the right to understand the risks and benefits of each treatment recommended or suggested by every physician.

18. The standard of care required the Clinic and Dr. Goulet to inform Pamela of the risks and benefits of each of her treatment options including the comparative risks of cancer recurrence and death, both with and without radiation, in order that she could make an informed choice regarding her treatment.

19. The Clinic and Dr. Goulet failed to adequately inform Pamela of the comparative risks in order that she could make an informed decision as to whether she should accept the significant risks of Dr. Goulet's radiation plan.

20. The Clinic and Dr. Goulet breached the standard of care. This is negligence.

### Failure to suspend radiation treatments in order to investigate.

21. A reasonably prudent radiation oncologist in touch with current peer reviewed medical literature would have recognized that Pamela's early reaction to radiation was unusual and severe and required immediate suspension of her radiation treatments in order to determine whether any underlying condition

would explain her extreme reaction to radiation and whether the risk of continued radiation treatment outweighed the risk of discontinuing it altogether. The standard of care required, and Pamela had the right to expect such an investigation.

22. The Clinic's and Dr. Goulet's choice to continue radiation treatment without investigating this situation was unsafe, endangered the patient, violated the standard of care, and was therefore negligent.

### Harms, losses and causation.

23. As a result of the negligence of the Clinic, Dr. Goulet, and other clinic employees, Pamela Jackson suffered permanent, painful, disabling, and disfiguring injuries and harms that have reduced her physical abilities and significantly diminished her ability to work and enjoy life.

24. The negligence of the Clinic, Dr. Goulet and other Clinic employees, has caused Pamela to have to undergo numerous dangerous, painful and expensive reconstructive surgeries each of which were accompanied by complications including infections and the failure of her surgical wounds to heal.

WHEREFORE, Plaintiff prays as follows:

A. For judgment against Defendants in amounts to be set forth prior to trial for all of Plaintiff's past and future pain and suffering, past and future loss of

enjoyment of life, past and future loss of earnings, and for such other general and compensatory damages as may be allowed by law;

B. For her costs of suit;

C. For trial by a jury;

D. For such other and further relief as the court deems just and appropriate in the circumstances.

Dated this 23rd day of February, 2018.

Michael G. Eiselein
Eiselein Law Firm PLLC
PO Box 1729
Billings, MT 59103
406-252-3461
Attorneys for Plaintiffs